J-A17042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| KENNETH CHARLES NOHE, JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KENNETH CHARLES NOHE, SR. | : | |
| | : | |
| Appellant | : | No. 3195 EDA 2022 |

Appeal from the Order Entered November 30, 2022
In the Court of Common Pleas of Bucks County
Civil Division at No(s): 2021-60451

BEFORE: KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.: **FILED NOVEMBER 28, 2023**

Appellant, Kenneth Charles Nohe, Sr. ("Grandfather"), appeals from the order entered in the Bucks County Court of Common Pleas, which granted the petition of Appellee, Kenneth Charles Nohe, Jr. ("Father"),[1] filed under the Protection from Abuse ("PFA") Act.[2] We affirm.

In its opinion, the trial court sets forth a lengthy and detailed recitation of the testimony provided during the four days of hearings in this case, as follows:

When Father was younger, he and Grandfather had a close

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In addition to protecting Father, the order at issue also protects Father's wife, Lisa Nohe ("Mother"), and their children, S.N. ("Son") (born in December 2007) and C.N. ("Daughter") (born in September 2009).

[2] 23 Pa.C.S.A. §§ 6101-6122.

relationship. As an example, Father worked as a busboy and waiter at Grandfather's Dinner Theater in Maryland, as did Father's teenage friends and soccer teammates.

Father and Mother have been together since 1991. They were married in 2006.

After Father met Mother, they moved to Utah. While they were driving cross-country to visit Maryland with Father's sister Catherine, Grandfather received a telephone call from Catherine. Catherine told Grandfather that Father, who was then in his twenties, tried to kill himself by cutting his wrists. Father returned to Maryland and began treatment with a psychiatrist. Grandfather accompanied Father to his psychiatric appointments. Father has been in continuing psychotherapy for twenty-seven (27) years.

When Father and Mother moved back to Maryland, they lived with Grandfather. Later, Mother and Father rented an apartment, but returned to live with Grandfather for a year-and-a-half "to save money." When Grandfather moved to downtown Baltimore, Father and Mother purchased Grandfather's former townhouse…in Timonium, Maryland. At that time, Grandfather was the proprietor of a "Dinner Theater" and "Sports Bar."

The testimony presented at these four hearings portrayed a disturbing and often toxic picture of a dysfunctional family dynamic, where Father and Grandfather were often angry and confrontational. There was also a history of physical violence between them.

Despite these volatile episodes, both Mother and Father requested that Grandfather provide childcare and companionship for their children, [Son] and [Daughter]. Both Mother and Father encouraged Grandfather to take an especially active role in children's daily lives.

The relationship with Grandfather and Father began to deteriorate approximately thirty (30) years ago.

A violent physical altercation occurred between Father and Grandfather in Grandfather's Sports Bar in Maryland on St. Patrick's Day, 1995. …

* * *

Mother described Grandfather as a person who does not like being told "no" and "who needs to control everything." When Grandfather does not "control everything," Mother has seen him "go to great lengths badgering, manipulating, getting in people's faces," and "being physical."

There have been numerous volatile episodes and physical confrontations between Grandfather and Father.

[I]n December…2007, Mother gave birth to [S]on[.] About eighteen months later, Mother gave birth to…[D]aughter[.] When the children were born, Father was working full-time and Mother was a flight attendant working only on weekends.

Because of their employment schedules, Grandfather was asked by Mother to provide childcare for [Son] from a very young age. …

Mother was having difficulty managing her job and childcare duties. Mother moved in with Grandfather in downtown Baltimore for a short time. A schedule formed: From the time [Son] was six months old to age five, Grandfather would pick up [Son] at 6:30 a.m., take him to get breakfast, feed him, change his diapers, take him to a local "train museum" (sometimes five days in a row), eat lunch, return to his apartment for a nap, and take [Son] home to his parents around 3:00 pm.

[Daughter] also began to stay with Grandfather when she was three (3) years old. [Son] and [Daughter] stayed overnight with Grandfather almost every weekend for thirteen (13) years. Grandfather testified: "Not only did I have them ([Son] and [Daughter]), I had all their friends with me most of the time."

Grandfather testified that he "watched a bunch of kids" every Saturday for years. Father believed, in retrospect, that these "indulgences" were "grooming" the children. According to Father, "Grandfather was creating part of the turmoil in [Son] where he would not listen to his parents,

- 3 -

where he would start to rebel against his parents." [Son] was "listening to someone (Grandfather) who encouraged him to lie, to hide, to think that wealth is—it would start to create, within [Son], some really ugly non-values."

\*    \*    \*

[Son] and [Daughter] have been diagnosed with certain mental health issues. [Son] is being treated for Attention-Deficit/Hyperactivity Disorder (ADHD), Tourette's Syndrome, and Anxiety. [Daughter] is also being treated for Anxiety.

\*    \*    \*

Grandfather has been separated from his wife Rose Nohe [("Grandmother")] for thirty-one (31) years. Despite this lengthy separation, Grandfather and Grandmother…are apparently still married. Grandfather often stayed with his girlfriend "Fran" at Fran's home in Phoenix, Maryland, near Father's home in Timonium, Maryland. Grandfather has been in a relationship with Fran for twenty-eight (28) years.

While in Florida [at Grandfather's vacation home] in 2019, an argument occurred after a long day at the beach. Father wanted to purchase "healthy food" to cook at home. The rest of the family wanted to order fast food at McDonald's because "they were really hungry." An argument [ensued]. During this argument, Father attempted to jump out of the passenger seat of the car when Grandfather was driving at a speed of approximately forty-five miles per hour. Grandfather grabbed Father around his neck and pulled him back into the car. Father turned to the back seat of the car where Grandmother…and the children were seated, and screamed that he was the one who was going to decide where and what they would eat.

On November 6, 2019, [Son] texted to Grandfather: "We have a huge problem with [Father.] I'll tell you the details later." [Son] told Father that [Daughter] was angry and they were having a "problem," and [Son] needed Father's help. According to [Son], Father attacked him by hitting him repeatedly in the arm and head.

- 4 -

Father described this incident differently. He testified that he slapped at [Son's] arms when [Son] was crying and upset. Father said he had only spanked [Son] one time when he was eight (8) years-old. [Son], however, told Grandfather that "Father hit him in the head more times than he could count" and hit him in the arm causing bruises. …

Grandfather told [Son] to call Mother. Mother was still flying for Delta Airlines three to five days at a time. Grandfather was also worried that Father would attempt to commit suicide again.

Grandfather alleged there were many times that Father would grab [Son] by his arm and make him go to his room.

Grandfather explained that when Father and [Son] would have arguments, often [Son's] punishment would be that he could not see Grandfather that weekend.

In 2019, Grandfather received a text from [Son] asking, "Poppa, why don't you come up and shoot some hoops?" Grandfather testified that they used to play "HORSE" and other basketball games. Father also came and they all played HORSE together. Two days later, Grandfather received another call from [Son] about playing basketball again. [Son] started running at a nearby soccer field to warm up. Father arrived and became enraged. Father asked Grandfather, "What the f' are you doing here?" Grandfather told Father that [Son] called him and they were going to play HORSE. Father said, "You are not invited here," grabbed Grandfather by the shirt and said, "You better get the f' out of here." Grandfather left.

Later, on August 26, 2020, Father called Grandfather around 10:00 p.m. pleading, "I need you here—[Son] bashed his head into the wall." Grandfather went to Father's home to try to visit [Son], who was now twelve (12) years old. After Grandfather let himself in, Father said, "I'm really glad you came. I really needed you here. I didn't want to hit [Son] again." [Son] told Grandfather that there was a fight between [Son] and [Daughter]. [Son] wanted to "make peace," but when [Son] went to kiss Mother, she "pushed him away." In response, [Son] bashed his own

- 5 -

head into a wall, breaking the sheetrock. Grandfather believes that all of these current "issues" started that day.

From August 2020, through January, 2021, [Son] repeatedly called Grandfather to tell him how Father would pull him aside and say negative things about Grandfather. For example, Father told him that Grandfather was a "liar" and "manipulator;" that when [Son] was older, Grandfather "would treat him like shit and wouldn't love him anymore," and that [Son] would probably end up hating Grandfather. Father also said that Grandfather had been "nice" to Father, but he learned later that Grandfather was a "bad person."

Mother told [Son] that Grandfather would leave [Son] for someone else and not love him anymore.

Grandfather advised [Son] to tell his parents what he said to Grandfather—that when they say negative things about Grandfather, it makes [Son] dislike his parents, not his Grandfather: "When you love someone, you don't want anyone speaking negatively about them." Grandfather stated that [Son] was "in crisis" because of the constant negative comments by his parents about Grandfather.

Father testified that Grandfather "is obsessed with my son[.]"

* * *

Father believed Grandfather to be "sexually predatory to [Son]." Father alleged that, although he has never witnessed it, "[Grandfather] touches children in ways they won't remember." Father claimed that Grandfather started to "sexualize" Father when he was about [Son's] age by telling him many graphic stories. As an example, when Father was 14 years old, Grandfather told him "that he got drunk and then raped a female police officer in the car because she was passed out."

Grandfather countered that the rape story was a lie. Grandfather also said there was never a time that he had [Son] without [Daughter] once [Daughter] asked to also go along with Grandfather. Sometimes, he would have [Daughter] for one night and [Son] on another night.

- 6 -

Father testified that around this time, when [Son] was twelve years old, [Son] told Father that Grandfather was still bathing him. Grandfather denied that this occurred.

During the third weekend in January, 2021, after Grandfather did not hear from the family all week, he texted Father: "Are we having a sleepover this weekend?"

Father texted, "Oh, no, not this weekend." The following weekend, Grandfather texted again. Father texted back, "Oh, no, not this weekend."

Around February 1st or 2nd, 2021, in a decision that had been building over time, Father and Mother imposed limits on Grandfather's interaction with the children; sleepovers wouldn't be every week, but every other week; every time there was a sleepover, Father or Mother would have to also sleep over, and Grandfather could not spend time with the children unless a parent was with them. Father texted Grandfather jokingly, "I can't wait to sit in the blue chair and have you wait on my kids and on me."

Grandfather explained that these limits would result in Father "picking" on [Son] and attacking Grandfather. Father told Grandfather, "you know, if you ever decide to do that let me know, otherwise there will be no sleepovers."

Although Father suspected sexual contact by Grandfather, no evidence was presented that Grandfather was "sexually predatory" toward either [Son] or [Daughter].

Grandfather testified that he knew there was going to be "problems" when he saw Mother at Sam's Club in December, 2020. Mother said to Grandfather, "I know [Son] loves you more than me, but I have to try to live with that."

On June 29, 2022, this [c]ourt [ordered Grandfather to undergo a psychiatric examination].

\* \* \*

The court-ordered psychiatric report was introduced into evidence by Grandfather's counsel. There was no finding

- 7 -

that Grandfather had a pedophilic or narcissistic personality disorder.

Father claimed that Grandfather then "began an all-out assault on my family." Father alleged that Grandfather sent threatening texts to them, which Grandfather denied. Grandfather said there had been no communication between them from late January, 2021, to early February, 2021, after Mother and Father declared that there would be no sleepovers unless they were also present at Grandfather's home.

Grandfather texted parents through March, 2021, suggesting what they could do to try to resolve their issues, but there was no response from Mother and Father. They told Grandfather that "they were fine and everything was fine."

Prior to March, 2021, Grandfather and [Son] constantly texted and Facetimed each other. Direct contacts and communications had ceased between them near the third week of January, 2021. [Son] tried to call Grandfather on some occasions, but his parents took his phone away or followed him into his bedroom. In February, 2021, [Son] was texting Grandfather and his parents took away his laptop computer. Grandfather said [Son] was "in crisis" because he could not speak with his Grandfather and that [Son] was locked in his room for days.

Grandfather said he called Child Protective Services. Other than this single statement, no evidence regarding intervention on [Son's] behalf by any children's agency was provided at any of these hearings.

[Son testified that Grandfather is the "person [he] love[s] most" and Son was very upset when Father and Mother restricted his time with Grandfather].

\* \* \*

Mother testified that around February 5, 2021, after the parents set these new boundaries, Grandfather came "storming" into their house without knocking and slammed the door. Grandfather screamed that "[Father and Mother]

- 8 -

were keeping his grandson from him and he was never going to see his grandkids again." He questioned why Father was constantly saying negative things about Grandfather to [Son] and predicted that [Son] would instead, "hate his parents and walk out the door when he was older." [Grandfather] promised "that we (Mother and Father) would regret it and that he would make our lives miserable."

Mother was "fearful" and "felt physically threatened" because Grandfather "was…screaming, arms up in the air, flailing. He seemed unhinged to me, like he was capable of doing anything." "I felt like he would hurt us if it meant getting what he wants." Grandfather threatened, "You have no idea how bad it will get." Father stated, "I take that as physical, as anything."

Grandfather promised [Son,] "Nothing will stop me from seeing you." Father stated that he was afraid Grandfather was going to hit or injure him.

[Son] testified that he and Grandfather realized that they were "not going to talk his parents out of the plan, and they would have to find another solution."

Grandfather insisted that he never sent any threatening texts to Father and Mother, and never barged into their home. Grandfather said he went there to get the key to his house because it was he who was afraid of someone coming into his home at night and hurting him.

On Saturday, February 6, 2021, Mother woke Father at 6:00 a.m., "terrified," stating "[Son's] gone." They suspected he was with Grandfather because of the prior threatening texts from Grandfather, and the incident where Grandfather barged into their home.

Mother and Father called the local police in Maryland. Mother and Father "immediately got into the car, started driving to [Grandfather's] house [and] different places where he would sometimes take [the] children" and "immediately texted" Grandfather and "called him." "We had no idea whether [Son] was safe, if he would ever be back."

[Son was with Grandfather at this time, and Father accused Grandfather via text of abducting Son and inflicting "abuse" by keeping Son away from his parents].

\*     \*     \*

[Son] was returned to Mother and Father's home around noon, six (6) hours later.

[Son had] called Grandfather the night before February 6, 2021, and asked Grandfather to meet him very early the next morning. [Son] told Grandfather that he was not going to tell his parents that he was leaving to meet Grandfather. Grandfather picked him up approximately five minutes driving time from [Son's] home. They met at a school parking lot next to the family's neighborhood. [Son] knew that his parents did not want him to meet his Grandfather, but he did not want a "big blow up where my dad got all angry." [Son] wanted to meet Grandfather to "talk to him about what to do and to, like, long-term…and try to find an escape from…the turmoil that was our house."

[Son] talked to Grandfather about wanting to be with him and leaving his parents' home. [Son] had packed a trumpet case with his clothes and shoes. [Son] testified that he probably asked Grandfather to "run away with him somewhere." After the first texts, [Son] and Grandfather turned off their cell phones so Mother and Father could not reach them. That day, they planned a second meeting in the same parking lot.

The next day, Grandfather and [Son] began secretly communicating through an online chat app called "Discord." Father testified that it was "all to get [Son] alone." [Son's] friend "Zach" helped install the app on Grandfather's phone so [Son] could secretly communicate with Grandfather. From the documents provided to this court and entered into evidence, it appears that Grandfather and [Son] were able to communicate via Discord from February 7, 2021, through February 14, 2021.

There were over forty (40) pages of Discord chats between them. In these chats, Grandfather instructed [Son] to delete their conversations on Discord so Mother and Father

would not find out that they had been texting. He told [Son] not to write things that would get Grandfather in "trouble." According to [Son], if his parents learned about these texts, [Son] would not be able to reach out to his Grandfather anymore.

The following Wednesday, February 10, 2021, Grandfather secretly met with [Son] again while Father was in the shower and Mother was out for a morning walk.

[In the Discord app exchange, Grandfather instructed Son to leave his parents a note saying that Son was going out for a walk and would be back in a couple of hours. Grandfather told Son where Grandfather would be if Son needed him during that time, in a public setting].

\* \* \*

Mother texted Grandfather at 10:19 a.m. [asking Grandfather to bring Son back home if Son was with him, and notifying Grandfather that Mother and Father would be contacting the police to put out an Amber Alert.]

Grandfather never responded. [Son] was returned home around noon that day. [Son] and Grandfather made plans for a third meeting to meet again in the back area of the school parking lot.

The third time [Son] went to meet his Grandfather, Father followed him. [Son] walked through the woods to the public school behind their house. Grandfather was waiting at a dumpster behind the school in the back parking lot. Father arrived and confronted Grandfather and told him that he may not take [Son] and shouldn't be having these secret meetings.

Father and Mother believed that these secretly-arranged meetings would not stop. After living in their home in Maryland for sixteen (16) years, "within a couple of days we were in a car heading to Pennsylvania" briefly staying at [Mother's] friend's house in New Jersey ([Son] said they stayed at a hotel in New Jersey). The family then stayed with [Mother's] brother "Uncle Tony" in Kintnersville, Bucks County, Pennsylvania, from March, 2021, until June, 2021.

Thereafter, the family moved to Upper Black Eddy, Bucks County, Pennsylvania, where they currently reside.

[Son] testified that his parents "tricked" the children into moving to Bucks County by asking whether they wanted to go to McDonald's, and then, "before they knew what was happening," the parents were taking them away. [Son] came to Bucks County with only the clothes he was wearing. Months later, his personal belongings arrived at their new home in Upper Black Eddy.

[Son] testified that while staying at his aunt and uncle's house, he reached out to Grandfather. [Son] received about two or three phone calls from Grandfather before his parents put an end to the calls.

Two or three weeks after the family settled in with "Uncle Tony," Father took [Daughter] to their former home in Maryland because the abrupt departure was very "emotional" for the children. A few days later, on March 3, 2021, Father also took [Son] to the former Maryland home because he also asked to visit there. When it was time to leave to return to Pennsylvania, [Son] refused to get into the car. He "raced to the townhome next door to ours where there was a punch code lock on the door, and he began punching in the code to get into the house." Father feared that "if [Son] got in that door, I would never see him again. He would be behind a locked door that my father would have legal ownership of."

Father knew that Grandfather had been seeking to purchase the townhouse next door, but Grandfather told him that he was "definitely not going to buy that property." Grandfather never told Father that he eventually purchased the adjoining townhome. Grandfather only gave the entrance key code to [Son] and told him to run into the townhouse if he had any "trouble" with his Father.

[Son], however, knew that Grandfather purchased [the townhouse next door to their former home in Maryland.]

[Son] admitted that he intended to run into Grandfather's house to escape his family. Previously, Grandfather "told

- 12 -

[Son] that he was going to buy a house next door in order to possibly solve…the situation so I was able to see him, like, on a long-term basis."

Grandfather claimed that he considered buying the townhouse in January, 2020 as an eventual "rental property" for Father. In the meantime, Grandfather wanted to move his wife, [Grandmother], into the townhouse next to Mother and Father because she had Alzheimer's Disease and Grandfather wanted to transition her to Maryland from Florida.

When Grandfather asked Mother about moving Grandmother to Maryland, Mother said she would help take care of [Grandmother] if she moved here. Contractors were coming into the townhouse to prepare estimates for repairs, so Grandfather put a digital lock on the door. Because the townhouse had been vacant for thirteen (13) years, and because of COVID protocols, repair estimates and the purchase of the home were delayed.

Grandfather eventually purchased the adjoining townhouse on December 4, 2020. He gave the entry code to [Son] around January, 2021. Grandfather insisted that Mother and Father had known that he purchased the townhouse next door [and Grandfather submitted text messages to prove same.]

When [Son] bolted for the keypad on the door, Father described [Son] as "distraught, …manic to morose, verbally abusive, physically violent, withdrawn. The whole spectrum."

Father restrained [Son] and called 911. He took [Son] to the Emergency Room at Greater Baltimore Medical Center ("GBMC"). [Son] was released the following day.

On the drive back to Pennsylvania, [Son] again "had a breakdown" and "said he wanted to hurt himself." Father stopped the car on the highway and called 911 again. [Son] was returned to the GBMC Emergency Room and was transferred to Sheppard Pratt Psychiatric Hospital in Maryland for the next twelve (12) days.

[Son] said that he was upset about not seeing his Grandfather, so in order to get his Father's attention, he threatened to hurt himself. He wanted Father "to stop and talk about why he is tearing apart the family the way he is."

Father had been in contact with [Son's] psychiatrist, Dr. Stuart Varon. Dr. Varon began seeing [Son] for ADHD when he was in first grade in 2015. Dr. Varon was aware of the problems with Grandfather. After the emergency room visit, Father discussed medications with Dr. Varon for [Son's] extreme psychological stress.

Dr. Stuart Varon, a child psychiatrist, testified that he first evaluated [Son] on March 13, 2015, for ADHD when [Son] was seven years old. [Son] also had a history of Tourette's or tic disorder.

Between 2015 and 2021, Dr. Varon "provided treatment with psychopharmacologic management [and] treated ADHD [for Son], … and over time [Son] developed a generalized anxiety disorder." Prior to January/February, 2021, [Son] was improving, and Dr. Varon was only seeing him once every three (3) months.

During [Son's] session on February 4, 2021, there was a reported increase in his oppositional defiant behavior. His parents were distraught. When Dr. Varon learned of [Son's] behavior surrounding his Grandfather, he observed [Son's] "mood dysregulation."

As noted, [Son] was admitted to Sheppard Pratt from March 3, 2021, to March 15, 2021. After [Son] was released from Sheppard Pratt, the parents distanced [Son] from Grandfather, and [Son's] mood settled down. [Son] began to see a therapist in Pennsylvania. Approximately a week after discharge, the therapist and [Son] talked about his fluctuating moods. At that time, [Son] was prescribed medicine for his mental health, and the family was working to help [Son] cope.

Dr. Varon then spaced out [Son's] visits. Dr. Varon saw parents on July 20, 2021, after the parents had decided to move to Pennsylvania. [Son] was then "doing well."

There were public telephones at Sheppard Pratt that [Son] used to contact Grandfather three (3) to five (5) times when he was first admitted. His parents then asked that the phone calls stop. [Son] asked Grandfather to come see him. Grandfather came to Sheppard Pratt and waved to [Son] from outside of the building. [Son] hoped Grandfather would take him and he wouldn't have to live with his parents anymore.

[Son] had asked someone from Sheppard Pratt to call Grandfather to tell him to meet at "Uncle Tony's" house the next day.

Grandfather explained that, on March 15, 2021, the day before [Son] was released from Sheppard Pratt, Grandfather received a phone call from someone at Sheppard Pratt to "meet at Tony's tomorrow at 12 o'clock." Grandfather said that he didn't know whose voice it was, but thought it may be Father because it sounded like him. Also, preceding that, Grandfather had sent multiple texts to Father around March 12, 2021, asking him not to take the children out of school because they had already missed school because of COVID.

Grandfather promised that he would not interfere with the children if Mother and Father would move back to Maryland. Another proposed compromise by Grandfather was that the parents allow [Son] and [Daughter] to see Grandmother[.] Grandfather knew generally where "Uncle Tony" lived, then Googled his address.

Grandfather testified that he received a call from [Son] on March 4, 2021, informing Grandfather that he was in Sheppard Pratt. [Son] asked Grandfather to come to see him. Grandfather went there the next morning and asked about [Son]. The hospital would not give Grandfather any information, however, a female worker there pointed to where [Son] would be located inside the hospital building. She told Grandfather that there was a phone there and she would ask [Son] to call Grandfather. [Son] called and told Grandfather to go around to the side of the building. Grandfather went around, waved, and said "I love you" in sign language even though he could not actually see [Son] from where he was standing.

- 15 -

On March 16, 2021, the family removed [Son] from Sheppard Pratt and took him to "Uncle Tony's" home in Pennsylvania. When Father was pulling his car into the driveway, Father got out of the car and immediately saw Grandfather. Grandfather had been waiting outside "Uncle Tony's" house and parked down the street behind some bushes. According to Grandfather, Father bought a new car, so Grandfather was not sure it was Father when they pulled into the driveway. Nonetheless, Grandfather started walking toward the car. [Son] immediately spotted Grandfather and ran to him. They said they both loved each other and hugged.

Grandfather said to Father, "Let's try to work things out." Father did not reply, and told [Son] to get into the house. [Son] put his arms around Grandfather and said that he wanted to go with Grandfather because he was scared. Grandfather replied, "[Son], you know, it can't happen. I told you that the law wouldn't allow that." Father again said, "[Son], get in the house." Grandfather told [Son] that he would always love him and wouldn't let anyone stop him from seeing him. Grandfather also warned [Son], "…Whatever you do, don't get upset; don't let them send you back to Sheppard Pratt." Father yelled at [Son] and took the children back to "Uncle Tony's" where they were staying in Kintnersville, Bucks County. Father told Grandfather, "You are not allowed to be here; you are trespassing." Father called the police.

Mother came out of the house screaming at Grandfather. Grandfather approached Mother and "Uncle Tony" "in a threatening, bellicose manner." Father recorded the conversation on his phone. Mother told Grandfather, "You're never going to see your grandkids again."

Grandfather threatened:

"Did you think you could get away from me? I know where your mother lives. I know where your brothers live. And I know where your friends live. There is no place you can go to get away from me. I will do whatever it takes. You have no idea how bad this will get."

- 16 -

Mother considered this as a threat to her whole family—that Grandfather would do anything: "He would take my son away from us, he would hurt us in order to get my son, in order to get what he wants."

Grandfather also told Mother, "You are trying to do to me what you did to your father" because Mother had not seen her father in twenty (20) years. Grandfather told Mother and Father that he would listen to them, but to "give [him] a chance to talk." Mother said, "No. I don't have to listen to you."

Mother and "Uncle Tony" told Grandfather that he was trespassing and asked him to leave. A neighbor intervened and told Grandfather to get the "f---" out of here. Grandfather then went to sit in his car and waited for the police to arrive.

Two Pennsylvania State Troopers arrived, and spoke to multiple people there. They then warned Grandfather that he should not return to the property again or he would be issued a Trespass citation.

According to an Order signed September 29, 2021…Grandfather filed a "Petition to Enforce Visitation" on March 24, 2021, in Maryland.

In his Petition for Visitation of [Son] and [Daughter] in Maryland, Grandfather asserted that he is a *de facto* parent. This custody case in Maryland was postponed until the present [PFA] case is concluded in Bucks County. …

[Son] spoke with Grandfather two (2) or three (3) times in the interim until Mother and Father put an end to the contact. Then, Grandfather returned to "Uncle Tony's" (with Grandmother…) approximately two weeks later. Grandfather claimed that Grandmother…asked him four (4) or five (5) times to take her to bring "Easter candy" to [Son] and [Daughter]. At first, Grandfather declined to take [Grandmother] to see the [grand]children, but when [Grandmother] began crying, Grandfather agreed to take her there.

When they arrived at "Uncle Tony's," [Grandmother] briefly went into the house. Grandfather stayed in his car. [Grandmother] was crying when she exited the house because the parents did not let her see [Son] and [Daughter]. Again, they all went to the parking area beside "Uncle Tony's" house and began arguing. Father again called the police. Grandfather and [Grandmother] then drove away.

Contrary to this recitation, [Son] testified that he was still in contact with Grandfather at the time, and this visit was another attempt to convince Father to let Grandfather be with [Son]. [Son] testified, "At the time, we were desperate. We didn't know what would work."

Grandfather was issued a citation in the mail for Trespassing. Grandfather was found guilty in District Court. Grandfather appealed from that conviction. The summary trespass conviction was affirmed after a *de novo* hearing held in the Bucks County Court of Common Pleas[.] Grandfather never went back to "Uncle Tony's" house thereafter.

Grandfather seemed to blame the guilty verdict on [Grandmother's] testimony, explaining that "it did not go well" because it was "one of her bad days." Grandfather did not testify at the *de novo* hearing.

The family moved from "Uncle Tony's" place in Kintnersville to a house in Upper Black Eddy, in Bucks County, in June, 2021.

In October, 2021, [Son] contacted Grandfather to inform him that his family had moved to Upper Black Eddy. Prior to this contact, Grandfather was unaware the family had relocated from Maryland to Bucks County, Pennsylvania.

Later that year, around September, 2021, Father saw signs in [Son's] behavior that led Father to suspect that [Son] was once again in contact in Grandfather. According to Father, [Son] was becoming verbally and physically abusive. Then, in October, 2021, Father found a piece of loose-leaf paper written by [Son] inside a lock box in [Son's] room. [Son] wrote several items on that paper, one of which questioned,

"Why did you want to meet at the Bridgeton House?"

Also, [Son] wrote: "Cocos Island—300 miles south Costa Rica in Pacific Ocean. 1-2 billion dollars in pirate treasure also a good vacation spot."

The Bridgeton House is a Bed & Breakfast approximately six hundred (600) feet from the family's new home in Upper Black Eddy. Father immediately contacted the police.

Pennsylvania State Trooper Michael Rogers went to The Bridgeton House to see if Grandfather had ever stayed there. The register showed that Grandfather made twelve (12) reservations between August 15, 2021, to December 19, 2021. At that point, Grandfather had stayed overnight five (5) times.

Father filed a [PFA petition] against Grandfather on March 19, 2021.

On October 21, 2021, Father returned to the Bucks County Justice Center to amend his prior Petition, noting all that had transpired since he filed the original Petition. On that date, Father was granted a Temporary Protection Order.

On October 24, 2021, a Pennsylvania State Trooper went to The Bridgeton House. The Trooper pulled around the back of The Bridgeton House and observed Grandfather in a dark-colored car with a Maryland license plate. The Trooper knocked on the window of the car and handed Grandfather the Temporary Protection Order. The Trooper explained to Grandfather that he was not to have contact with [Son] until the next hearing in court. The Trooper testified that Grandfather kept asking the same questions in different ways, "Why can't I be with my grandson? I just want to spend time with my grandson." According to the Trooper, Grandfather seemed "shocked" that this was occurring. That was Grandfather's last contact with [Son].

[Son] testified and confirmed that he met with Grandfather three (3) to five (5) times without his parents' permission. [Son] stated: "I completely was the one who did it." "…Kind of the same with the running away part."

Grandfather testified that he had no communication with [Son] for seven (7) months after he received the Trespass citation. Then, Grandfather received a phone call from [Son] in October, 2021. [Son] told Grandfather that they had moved, and now lived in Bucks County. Grandfather said he planned to meet [Son] at the Homestead Coffee house located a block-and-a-half from [Son's] house in Upper Black Eddy. At the first meeting, [Son] rode his bike to the Coffee House. Grandfather and [Son] met for just a minute because [Daughter] was following him. They walked on a trail and talked. [Son] hugged his Grandfather and told him, "meet me next week, same time." When they met each time, [Son] would ask Grandfather to meet him at a certain time the following week.

Grandfather initially denied having any scheduled meetings with [Son] at The Bridgeton House, although their fourth meeting was scheduled. Grandfather told [Son] that he would meet him between 9:00 a.m. and 12:00 p.m. that day. Grandfather said his partner "Fran" and he sat on the porch of The Bridgeton House waiting for [Son], who usually arrived around 10:30 a.m. Grandfather stated that it was cold that day, so he then waited inside his car in the back parking lot of The Bridgeton House.

On this occasion, a State Trooper knocked on the car window. Grandfather was told that Father accused him of trying to kidnap [Son] and take him to an island off the coast of Costa Rica. As noted, [Son] had mentioned Costa Rica in the letter that Father found in the lock box in his room. Grandfather denied that he and [Son] ever discussed an island with buried treasure.

Grandfather minimized his encounters with [Son]. He stated that he only saw [Son] three (3) times for a total of twenty (20) minutes. Grandfather rationalized his behavior by asserting that he met with [Son], even though Father and Mother were unaware of these contacts, because [Son] "was in crisis." Grandfather testified that he was concerned because [Son] told him that Father put his hands on him again twice, sometime between March, 2021, and October, 2021.

(Trial Court Opinion, filed 3/22/23, at 2-33) (internal citations omitted).

Procedurally, the court held hearings on the PFA petition on June 29, 2022, September 21, 2022, October 19, 2022, and November 30, 2022. At the conclusion of the last hearing, the court entered a final PFA order against Grandfather for a period of two years, protecting Mother, Father, Son, and Daughter. Grandfather timely filed a notice of appeal on December 16, 2022. On January 9, 2023, the court ordered Grandfather to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Grandfather complied on January 26, 2023.

Grandfather raises 14 issues for our review:

> 1. Did the [c]ourt commit an error of law in finding that [Grandfather] had committed one or more act(s) of abuse as defined in the Pennsylvania PFA Statute, 23 Pa.C.S. § 6102(a)?
>
> 2. Based upon the evidence presented at trial, could a reasonable fact finder conclude that [Grandfather] perpetrated one or more act(s) of abuse as defined in the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6102(a)?
>
> 3. Did the [c]ourt commit an error of law in finding that [Grandfather] had committed one or more act(s) of abuse as defined in the Pennsylvania PFA Statute, 23 Pa.C.S. § 6102(a)(5) because, based upon the evidence presented at trial, [Father] and the other named protected persons could not be in reasonable fear of bodily injury from [Grandfather]?
>
> 4. Did the [c]ourt commit an error of law in finding that [Grandfather] had committed one or more act(s) of abuse as defined in the Pennsylvania PFA Statute, 23 Pa.C.S. § 6102(a)(5) because, based upon the evidence presented at trial, [Grandfather] did not engage in a course of conduct toward, nor follow [Father], nor any other named protected person, without proper authority, nor commit repeated acts

- 21 -

towards [Father] or any of the protected parties?

5. Did the [c]ourt commit an error of law in issuing a protective order pursuant to the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6101 et seq., because no evidence was presented that [Grandfather] caused, nor attempted to cause upon [Father,] and/or the protected persons, bodily injury, nor threatened [Father] or the protected persons with bodily injury, thus making it unreasonable for [Father] and the protected persons to fear bodily injury from [Grandfather]?

6. Based upon the evidence presented at trial, could a reasonable fact finder conclude that a protective order pursuant to the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6101 et seq. is necessary to protect [Father] and the named protected persons from [Grandfather]?

7. Did the [c]ourt commit an error of law at the time of trial in permitting and considering testimony regarding [Father's] status as a firearms owner despite no allegations that [Grandfather] had ever used firearm(s) against [Father] and the named protected parties, nor threatened anyone whatsoever with firearm(s) or the use of firearm(s) against them?

8. Did the [c]ourt commit an error of law and violate [Grandfather's] right to due process by pre-judging [Grandfather] prior to the close of testimony, when, based only upon the testimony presented by [Father], and prior to hearing any defense and/or rebuttal witnesses, the [c]ourt opined that [Grandfather] is "unhinged", "diabolical", "harassing", "volatile", "threatening", and entered an Interim Order, which, *inter alia*, ordered [Grandfather] to undergo a psychiatric evaluation at his own expense?

9. Did the [c]ourt commit an error of law at the time of trial in permitting and considering testimony from Stuart Varon, M.D. because that testimony was irrelevant and the prejudicial effect of that testimony outweighed its probative value?

10. Did the [c]ourt commit an error of law in failing to grant

[Grandfather's] Motion to Dismiss made on the record after [Father] rested his case because [Father] had failed to provide evidence that a reasonable fact finder could use to conclude that [Grandfather] had committed one or more act(s) of abuse as defined in the Pennsylvania PFA Statute, 23 Pa.C.S. § 6102(a)?

11. Did the [c]ourt commit an error of law in granting a protective Order to [Father] for the purpose of preventing [Grandfather] from contacting his grandson (contrary to [Father's] wishes) because that purpose is beyond the scope of the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6101, et seq?

12. Did the [c]ourt commit an error of law in granting a protective Order as to each of the named protected persons, whether individually or collectively, because, based upon the evidence presented at trial, a reasonable fact finder could not conclude that [Grandfather] perpetrated one or more act(s) of abuse as defined in the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6102(a) as against any of the named protected persons whether individually or collectively?

13. Did the [c]ourt commit an error of law in granting a Protection from Abuse Order against the [Grandfather] where there was no evidence that [Grandfather] had ever committed any act of violence against any person?

14. To the extent that the [c]ourt found [Grandfather] to have committed one or more act(s) of abuse as a result of continuing to have contact with his grandson, at the grandchild's request but against the wishes of [Father], did the [c]ourt commit an error of law because having done so does not amount to an act of abuse as defined in the Pennsylvania Protection from Abuse Statute, 23 Pa.C.S. § 6102(a)?

(Grandfather's Brief at 9-12).[3]

_____

[3] Grandfather has abandoned his fifth issue on appeal (**see id.** at 44-45), so we need not address this issue.

"In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." ***Stamus v. Dutcavich***, 938 A.2d 1098, 1100 (Pa.Super. 2007) (quoting ***Drew v. Drew***, 870 A.2d 377, 378 (Pa.Super. 2005)). "When interpreting statutes, we exercise plenary review." ***Stamus, supra*** (internal citation and quotation marks omitted). Additionally, "[t]his [C]ourt defers to the credibility determinations of the trial court as to witnesses who appeared before it." ***Karch v. Karch***, 885 A.2d 535, 537 (Pa.Super. 2005).

For purposes of disposition, we address Grandfather's first, second, third, fourth, sixth, eleventh, twelfth, thirteenth, and fourteenth issues together, as they are related to the sufficiency of the evidence to sustain the PFA order.[4] Grandfather asserts that the court entered the PFA against him under 23 Pa.C.S.A. § 6102(a)(5), where Grandfather allegedly engaged in a course of conduct or committed repeated acts under circumstances that place a person in reasonable fear of bodily injury. Grandfather argues, however, that the only "course of conduct" or "repeated acts" at issue here were directed at Son, who was not in any fear of Grandfather. Grandfather

---

[4] We note that Grandfather cites the relevant law for some of these issues, but not for all of them, in violation of Pa.R.A.P. 2119(a). Nevertheless, the main challenge in these issues is to the sufficiency of the evidence. Thus, we will not deem the issues related to the sufficiency of the evidence waived for failing to cite relevant legal authority on this basis, as the issues can be read together as sub-questions concerning the sufficiency of the evidence for the court's PFA order.

acknowledges that he met Son at various times near the house in Maryland, at the hospital, and in Pennsylvania. Grandfather also concedes that he met Son against Father and Mother's wishes. Nevertheless, Grandfather maintains that this "course of conduct" was not directed at anyone else. Further, Grandfather contends that his actions were to intervene and to protect Son from an abusive home environment, which the court should have considered in establishing whether Grandfather's conduct constituted "abuse" under the PFA Act. Grandfather insists his conduct was out of love and concern for his grandson. Grandfather emphasizes that Son was suffering physical and emotional abuse at home, and that Grandfather sought to prevent Son from harming himself. Under these circumstances, Grandfather submits that his actions did not constitute "abuse" under the PFA Act.

Grandfather also highlights the trial court's reasoning that something bad might happen to Son if he continues to meet with Grandfather in secret. Grandfather suggests the court's reasoning is logically insufficient to justify the court's ruling. For example, Grandfather posits that if Son were to run away from home, it would be safer for Son to run to Grandfather's home than to the streets.

Grandfather reiterates that Son is not in fear of Grandfather. Grandfather avers that "[i]n light of [Father's] histrionics and discredited allegations, the [t]rial [c]ourt could not simply take him at his word that he has an actual fear of bodily injury from [Grandfather] or fears that

[Grandfather] will injure [Son]." (Grandfather's Brief at 42). Grandfather insists that a fear of bodily injury is not reasonable based on Grandfather's prior actions. Grandfather maintains that nothing in the record suggests that Grandfather has threatened Father with physical harm.

Grandfather asserts that his conduct was not without proper authority or unprompted. To the contrary, Grandfather contends that Son invited Grandfather and prompted Grandfather to meet because Son could not rely on his physically and emotionally abusive parents to tend to his emotional needs.

Grandfather stresses that nothing in the record suggests that Son is at any risk of physical or sexual abuse from Grandfather. Grandfather maintains that the court entered the PFA order for the improper purpose of preventing Grandfather from undercutting Father and Mother's authority to control their son. Grandfather submits this is a "perversion of the purpose of the [PFA s]tatute." (*Id.* at 46).

Grandfather further complains that the court applied "a scattershot approach in determining that each of [the] protected parties would be in reasonable fear of bodily injury and thus require protection." (*Id.* at 54). For example, Grandfather insists that there is no evidence that any of his conduct pertained to Daughter or that Grandfather even had contact with Daughter in the relevant time.

Grandfather emphasizes that the record contains no evidence that he

ever threatened or committed any act of violence against any of the named protected parties or against anyone at all. Grandfather maintains that he was the victim in the 1995 altercation with Father, and not the other way around. Grandfather claims the court erred in its assessment that Grandfather's conduct resulted in reasonable fear of bodily injury.

Grandfather contends that the foundation of the court's finding of abuse is Grandfather's repeated course of conduct in having "forbidden" contact with his grandchild and connecting that conduct to reasonable fear of bodily injury. Grandfather submits that the court's connection between his benevolent contacts with his grandson and a reasonable fear of bodily injury is tenuous.

Grandfather further argues that Father's purpose in filing the PFA petition was to prevent Grandfather from having contact with Son against Father and Mother's wishes. Grandfather suggests that this purpose is beyond the scope of the PFA Act, which narrowly limits the definition of abuse to five enumerated definitions. Grandfather claims the trial court attempted to "stitch together its rationale by comparing Grandfather's conduct to certain criminal offenses such as concealment of the whereabouts of [a] child or luring a child into a motor vehicle." (*Id.* at 52-53). Grandfather maintains, however, that the PFA Act does not seek to determine criminal culpability. Grandfather contends that just because certain conduct might constitute a criminal offense under the Crimes Code does not make it, *de facto*, an act of abuse under the PFA Act. Grandfather concludes the record evidence was

- 27 -

insufficient to support the entry of a PFA order, that the PFA order exceeded the scope of the PFA Act, and this Court must reverse.[5]  We disagree.

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1262 (Pa.Super. 2008) (quoting **Custer v. Cochran**, 933 A.2d 1050, 1054 (Pa.Super. 2007) (*en banc*)).  "[T]he Protection From Abuse Act does not seek to determine criminal culpability.  A Petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." **Snyder v. Snyder**, 629 A.2d 977, 982 (Pa.Super. 1993).  "A preponderance of the evidence is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the [criterion] or requirement for preponderance of the evidence." **Karch, supra** at 537 (internal citation and quotation marks omitted).

---

[5] Grandfather also suggests that the court's entry of the PFA order here was premature in light of the pending Maryland custody case in which Grandfather is alleging that he stands *in loco parentis* to Son and Daughter.  (**See id.** at 44).  The record demonstrates that the Maryland court stayed the custody proceedings pending resolution of this PFA action.  Nevertheless, Grandfather made no challenge to proceeding on the PFA case first in the trial court.  **See** Pa.R.A.P. 302(a) (stating issues not raised in trial court are waived and cannot be raised for first time on appeal).  Further, Grandfather cites no law whatsoever to support the position that the custody matter should precede the PFA proceedings.  As this claim is distinct from the other issues challenging the sufficiency of the evidence, we deem this particular claim waived and will not give it further attention.  **See Foster v. Nuffer**, 286 A.3d 279, 284 n.2 (Pa.Super. 2022) (explaining that failure to cite relevant legal authority in support of claim constitutes waiver of claim on appeal).

The PFA Act defines "abuse" as follows:

**§ 6102.  Definitions**

**(a)  General rule.**—The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

\*    \*    \*

(5)  Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury.  …

23 Pa.C.S.A. § 6102(a)(5).  "When a claim is presented on appeal that the evidence is not sufficient to support an order of protection from abuse, the reviewing court must view the evidence in the light most favorable to the verdict winner, granting [him] the benefit of all reasonable inferences." **Mescanti v. Mescanti**, 956 A.2d 1017 (Pa.Super. 2008) (internal citation and quotation marks omitted).  "The reviewing court then determines whether the evidence was sufficient to sustain the [trial] court's conclusions by a preponderance of the evidence." **Id.**

As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply. **Fonner v. Fonner**, 731 A.2d 160 (Pa.Super. 1999).  **See also T.K. v. A.Z.**,

157 A.3d 974 (Pa.Super. 2017) (holding appellee established abuse under Section 6102(a)(5) of Act, where appellant repeatedly followed appellee in his vehicle, in local grocery store, at sporting events, and in other locations; appellant also kept track of appellee's whereabouts and constantly drove past her home and honked car horn; appellee testified about deep concern for her safety and fear that appellant's behavior would eventually escalate to cause her bodily harm); **R.G. v. T.D.**, 672 A.2d 341 (Pa.Super. 1996) (holding appellee established abuse under Section 6102(a)(5) of Act, where appellant repeatedly called appellee and sent her unwanted, threatening e-mails; appellee testified she was "very scared" by appellant's increasingly hostile messages and was afraid to walk around campus). Further, the defendant's intentions are irrelevant to the analysis as to whether a PFA order is warranted. **See B.D.K. v. T.D.K.**, No. 1083 MDA 2019 (Pa.Super. filed Sept. 30, 2020) (unpublished memorandum)[6] (holding that husband's intent has no relevance in determination of whether wife was reasonably in fear of bodily injury for purposes of PFA sufficiency analysis).

Instantly, the trial court evaluated the sufficiency of the evidence to justify entry of the PFA order as follows:

> The preceding facts clearly demonstrate a course of conduct and repeated acts toward another person without proper authority and under circumstances which placed the parents in reasonable fear for themselves and their son….

---

[6] **See** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for their persuasive value).

Grandfather's counsel asserted that this was not an abuse case. This court disagrees.

"The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000).

Both Father and Mother made a decision to be present when Grandfather was spending time with their children. This is a parental decision. Rather than spending time with the children on those terms, Grandfather refused, and on at least three (3) separate occasions secretly met [Son] without his parents' knowledge or approval. Grandfather argued that this contact was welcomed by [Son]. That is of no moment. He is a child. The decision of the parents is paramount and controlling.

According to Father, because the parents believed that Grandfather would not stop secretly meeting [Son], they left their home in Maryland where they lived for the past sixteen years and moved to Pennsylvania. That did not deter Grandfather. He met with [Son] on at least three (3) subsequent occasions and planned to continue to meet with him in the future.

[Son] is in psychiatric treatment. [Son] is a vulnerable child. He was admitted to a hospital in Maryland for almost two weeks to treat his mental illness. Grandfather surreptitiously went to the hospital knowing that the parents did not want him to contact [Son] and contrary to their parental authority. When Grandfather learned that he was not a permitted hospital guest, he accepted an employee's offer to convey a surreptitious message to [Son].

The parents rightfully distrust Grandfather, but more importantly, they are concerned about [Son]. When they said [to Grandfather after Son went missing], "Bring him home now," Grandfather said that "he is talking to [Son], taking him for something to eat," and will bring him home when he is done with him.

Grandfather repeatedly uses the excuse that [Son] is "in crisis" to justify their meetings. *See Raker v. Raker*, 847 A.2d 720 (Pa.Super. 2004) (intent of abuser is of no moment). [*See also B.D.K., supra*.]

If [Son] threatens self-harm, Grandfather should contact Mother and Father to inform them that [Son] threatened to hurt himself and that Grandfather is available for assistance. If he was aware of some danger to the child, Grandfather's duty was to inform the parents, the police, or a Child Protection Agency.

Grandfather ignores the fact that [Son], who has threatened to hurt himself, and sees a psychiatrist and therapist for mood dysregulation, is being forced into the vortex of a dispute between Mother and Father and Grandfather. [Son] also testified that he threatened to hurt himself to get his Father's attention.

Even when the parents say, "we're calling the police," that does not deter Grandfather. Grandfather tells [Son] that he'll be "everywhere."

Grandfather continually encourages [Son] to leave his parents' care without their knowledge. Grandfather encourages flight by [Son]. This is dangerous. What happens if [Son] takes off and goes somewhere to meet Grandfather that is not safe, or [Son] finds himself in an emergency situation?

Grandfather has met [Son] in secluded locations. What happens if Grandfather does not arrive on time? Grandfather's encouragement for [Son] to flee his home is so pervasive that The Bridgeton House Bed & Breakfast recorded numerous past and future reservations scheduled by Grandfather with [Son].

Grandfather tells [Son] that they are doing nothing wrong. While in Maryland, Grandfather recklessly tells [Son] that if he ever has to "escape for any reason," he can access the keypad and run to Grandfather's house next door. Once that occurs, the parents would be locked out of the house and Grandfather would be the only other person who knew the entry code.

Father said that [Son] was "abducted" in Maryland while the family was asleep. He may not have been "abducted" in the literal sense, but he was lured from his home to secretly meet with Grandfather.

\* \* \*

Grandfather was found guilty of Trespass in Pennsylvania, which should have conveyed a strong message. Grandfather ignored that message. Once [Son] informed him of the address of their new home in Upper Black Eddy, Grandfather scheduled more secret meetings at or near a local Bed & Breakfast.

It is not a defense that [Son] called Grandfather and asked to meet with him. Grandfather should have said, "The answer is no—Your parents have said, no. Go home. I'll talk to you tomorrow." Instead, contrary to the wishes of the parents, the secret meetings continued.

Grandfather encourages and facilitates all of these episodes. …

Grandfather's counsel argued that these events were simply an "ego contest" or a custody issue, at most, and that Grandfather was prompted by [Son] to come to see him. Grandfather also argued that he was worried about [Son] and Grandfather did not intend to harass anyone.

The "Discord" chats between Grandfather and [Son],… compel the opposite conclusion.

The secret communications on Discord were a window into Grandfather's manipulation of [Son] against his parents' wishes. …

\* \* \*

[Son] knows that his meetings with Grandfather are wrong and may be illegal. …

\* \* \*

The purpose of the [PFA] Act is to cease the abuse and protect the parties from future abuse. While there is no bodily injury here, [Son] secretly leaves his home to meet Grandfather without his parents' consent. This is a course of conduct which creates a reasonable fear of potential bodily injury to [Son]. If these secret meetings continue, [Son], because of his age and his ongoing mental health issues, might be in jeopardy of accidental physical injury.

There are threats to the family. It is reasonable for the parents to fear Grandfather. He must have his way, no matter what, and no one will stop him. He owns firearms. Grandfather becomes unhinged when he doesn't get what he wants. …

Father testified that they are afraid to let [Son] out of their sight. When [Son] has activities, his parents drive him there and stay upon the premises. [Son] testified that he wanted to run away, and took the steps of bringing his trumpet case packed with his clothes and shoes when he met Grandfather.

Father testified, "We are afraid every day…that he will take our son and we will not see him again. We are afraid of the—of [Son], who achieves such a healthy place when [Grandfather's] influence is not around, that he will regress into this—this psychological breakdown, defiance, physical aggression, anger, physical abuse, verbal abuse." …

Father explained that [Son] is "doing so well" now that he is not interacting with his Grandfather. He is making friends and engaging in activities. [Son] agreed that things were going well at Palisades High School where he is in the 9th grade, and is on the wrestling team. He has made friends at school. The parents fear that if [Son] has contact with his Grandfather, he will revert to the same mental state where he was threatening to hurt himself or run away from home.

Our Order of no contact with [Son] is squarely within the scope of the PFA. …

Therefore, as supported by all evidence presented, this [c]ourt properly issued a [PFA] Order against Grandfather

- 34 -

directing him not to "abuse, harass, stalk or threaten" Father, Mother, [Son] or [Daughter] for a period of two (2) years. …

In this Opinion, we have characterized the present circumstances as confrontational and often toxic, indicative of a dysfunctional family dynamic, especially as it affects [Son].

We recognize that the seeds of this conflict were sown long before these [PFA] hearings were heard.

Father, who has his own mental health history, together with Mother, established a pattern of enlisting Grandfather to provide continuing care for their children when both Father and Mother were either unwilling or unable to fulfill those responsibilities.

We cannot, however, alter the unfortunate history of the troubled relationship between the parties. We cannot unring this bell.

While we recognize that the facts of this case are certainly unique, we have solely focused upon the recent conduct of Grandfather and the vulnerability of [Son], who is still a minor child subject to the control and authority of his parents.

(Trial Court Opinion at 41-51) (some internal citations omitted).

The record supports the court's analysis that a PFA order was warranted under the facts of this case. Specifically, the record shows after Mother and Father restricted Grandfather's access to Son and Daughter by way of stating that all sleepovers would take place every other weekend (instead of every weekend), and with Mother or Father present, Grandfather would not abide by their choice. Instead, Grandfather rejected Mother and Father's new "plan" and tension in the family grew. When Grandfather had "secret" meetings with

Son against Mother and Father's wishes, Father and Mother abruptly left their home in Maryland and moved to Pennsylvania to get away from Grandfather. Grandfather followed the family to Uncle Tony's house after receiving the message from someone at Sheppard Pratt, and refused to leave the premises until police arrived, even though Mother, Father, and Uncle Tony asked him to leave. Two weeks later, Grandfather again showed up outside of Uncle Tony's residence, this time with Grandmother, which ultimately resulted in a trespass conviction against Grandfather. Although Grandfather stayed away from the family for several months thereafter, when Son asked Grandfather to meet him in October 2021, Grandfather again arranged surreptitious meetings with Son.

On this record, Grandfather knowingly engaged in a course of conduct or repeatedly committed acts, such as following Father and his family, without proper authority. *See* 23 Pa.C.S.A. § 6102(a)(5). Additionally, these circumstances placed Mother and Father in reasonable fear of bodily injury. *See id.* Although Grandfather insists that Mother and Father's fear of bodily injury was not reasonable, the trial court was free to reject Grandfather's version of events in favor of testimony from Mother and Father. *See Karch, supra*. Mother and Father testified that Grandfather threatened to do anything to continue seeing Son, that nothing would stop him, and that he knew where Mother's family members lived. We will not disturb the trial court's credibility determinations concerning the reasonableness of Mother

and Father's fear of Grandfather. *See id.*

We also agree with the trial court that Grandfather's love for Son or intent to protect him are irrelevant here. *See Raker, supra*; *B.D.K., supra*. As Father points out in his brief on appeal, if Grandfather was genuinely concerned that Father was abusing Son or that Son was "in crisis," he could have contacted a child welfare agency.[7] Additionally, Grandfather claims that he filed a petition for custodial rights in Maryland in March 2021. Nevertheless, if Grandfather was concerned that parents were improperly restricting his access to his grandchildren, Grandfather should have waited until the outcome of those proceedings before continuing his secret meetings with Son, which Grandfather knew were against the wishes of Mother and Father. Viewed in the light most favorable to Father as the verdict winner, the record demonstrates that Father established Grandfather's abuse under the Act. *See* 23 Pa.C.S.A. § 6102(a)(5); *Mescanti, supra*. *See also T.K., supra*; *Fonner, supra*; *R.G., supra*. Further, the court's entry of the PFA order to protect Father, Mother, Son, and Daughter was squarely within the scope of the PFA Act. *See* 23 Pa.C.S.A. § 6108(a)(6) (stating that court may enter PFA order prohibiting defendant from having any contact with plaintiff

---

[7] As the trial court points out, although Grandfather made one statement that he went to child protective services in Maryland when Father allegedly beat Son (*see* N.T. Hearing, 11/30/22, at 33), Grandfather introduced no evidence that he contacted a child welfare agency or the results of any such investigation.

**or minor children**, including, but not limited to, restraining defendant from entering place of employment or business or school of plaintiff **or minor children** and from harassing plaintiff **or plaintiff's relatives or minor children**). Therefore, Grandfather's first, second, third, fourth, sixth, eleventh, twelfth, thirteenth, and fourteenth issues merit no relief.

In his seventh issue, Grandfather argues that the court admitted testimony, over his objection, that Grandfather is a gun owner. Grandfather asserts that the court believed such testimony was relevant to the PFA Act. Grandfather emphasizes that Father admitted in his PFA petition that Grandfather did not threaten Father or Mother with physical harm. Grandfather suggests that Father sought to introduce this testimony to "tie that fact in some amorphous way to violence or [Grandfather's] violent disposition." (Grandfather's Brief at 47). Grandfather maintains that the court's admission of this evidence prejudiced the court's opinion of Grandfather and contributed to the court's ruling against him. Grandfather concludes the court's evidentiary ruling was improper, and this Court must grant relief. We disagree.

Instantly, Grandfather cites no law whatsoever to support his claim that the court's evidentiary ruling was improper. (**See id.** at 46-48). Grandfather's failure to support this claim with relevant legal authority constitutes waiver of the issue on appeal. **See Foster, supra**.

In his eighth issue, Grandfather argues that after Father had rested his

case, but before Grandfather had an opportunity to put on a defense, the trial court "made up its mind about [Grandfather]." (Grandfather's Brief at 48). Grandfather insists that the trial court's "prejudice and bias against [Grandfather] was apparent when it concluded only upon [Father's] evidence that [Grandfather] is 'unhinged' and 'potentially volatile' … and ordered [Grandfather] to undergo a psychiatric evaluation at his own expense." (*Id.* at 48-49). Grandfather also highlights that the trial court referred to him as a "creepy old man." (*Id.* at 49). Grandfather concludes that the court was biased against him, and this Court must grant appropriate relief. We disagree.

Instantly, the sole case that Grandfather cites to in support of this claim is *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), for the general proposition of law that Grandfather had a right to present evidence in his own defense.[8] Nevertheless, Grandfather cites no law relevant to allegations of bias or what a party must prove to succeed on a claim of trial court bias. Likewise, Grandfather cites no law to suggest that the court lacked authority to order him to undergo a psychiatric evaluation. Consequently, Grandfather's eighth issue is also waived.[9] *See Foster, supra*

---

[8] We note that Father rested his case after the first day of testimony on June 29, 2022. The remaining three days of testimony consisted of Grandfather's defense. Clearly, the court allowed Grandfather to present evidence in his own defense here.

[9] Moreover, we note that "[a]llegations of bias and prejudice constitute some of the most serious charges which can be hurled against a court. *Kenworthy*
*(Footnote Continued Next Page)*

(holding appellant waived issue where single citation to rule of evidence was inadequate to fulfill appellant's obligation to cite to and discuss pertinent legal authorities).

In his ninth issue, Grandfather argues that the trial court allowed Father to present testimony from Son's treating psychiatrist, Dr. Varon, over Grandfather's objection.[10]  Grandfather insists that Dr. Varon provided no evidence of Grandfather's abuse.  Similar to the improper testimony regarding Grandfather's gun ownership, Grandfather complains Dr. Varon's testimony was admitted "only to cast aspersions concerning [Grandfather] standing for the proposition that [Son's] symptoms got worse when he had more contact

---

**v. Burghart**, 361 A.2d 335, 338 (Pa.Super. 1976), *appeal dismissed*, 478 Pa. 20, 385 A.2d 975 (1978).  Before reversal is warranted on these grounds, the record must clearly show prejudice, bias, capricious disbelief or prejudgment. **Id.**  "When the trial [court] is assailed as lacking impartiality, the only way to meet this point is to examine the testimony [as a whole], not depending upon sentences plucked out here and there."  **Id.**  Here, the record and the PFA hearing transcripts as a whole make clear that the court remained impartial and treated both parties equally, notwithstanding some of the court's remarks about Grandfather.  **See id.**  Additionally, the record shows that the court also referred to Father as "creepy in many respects." (N.T. Hearing, 11/30/22, at 177).  Further, the court noted that Grandfather's counsel did not object to the psychiatric evaluation, which was favorable to Grandfather in any event. In fact, it was Father's counsel who objected to admission of Grandfather's psychiatric evaluation.  (**See id.** at 14).  Thus, even if Grandfather had preserved this issue, it would merit no relief.

[10] The trial court stated in its opinion that Grandfather failed to object to the admission of Dr. Varon's testimony during the proceedings.  (**See** Trial Court Opinion at 47).  The record supports the court's statement.  (**See** N.T. Hearing, 6/29/22, at 111-135) (during Dr. Varon's testimony, Grandfather poses no objection to Dr. Varon testifying).

with his Grandfather." (Grandfather's Brief at 49). Grandfather maintains Dr. Varon's testimony was irrelevant and contributed toward the court's prejudice against him. Grandfather concludes the court's evidentiary ruling was improper, and this Court must grant relief. We disagree.

Instantly, Grandfather cites no law whatsoever to support his claim that the court's evidentiary ruling was improper. (**See id.**). Grandfather's failure to support this claim with relevant legal authority constitutes waiver of the issue on appeal.[11] **See Foster, supra**.

In his tenth issue, Grandfather complains that the court erred in denying his motion to dismiss made after the conclusion of Father's presentation of evidence. Grandfather asserts that following the first day of hearings in this case, even if the trial court had accepted all facts in a light most favorable to Father, that Father failed to make a case upon which relief under the PFA Act could be granted. Grandfather insists that Father provided no evidence in his case that Grandfather injured him, threatened him with imminent serious bodily injury, falsely imprisoned him, committed sexual abuse, or engaged in a course of conduct directed towards him, such that the trial court should have dismissed the PFA petition at that time. Instead, Grandfather complains the trial court endeavored to create a new category of abuse based loosely on the

---

[11] As previously stated, Grandfather also failed to object to Dr. Varon's testimony in the trial court. Thus, this issue would also be waived on that basis. **See generally** Pa.R.A.P. 302(a) (stating issues not raised in trial court cannot be raised for first time on appeal).

doctrine that parents have a fundamental right to parent their children in a way they see fit. Grandfather concludes the court erred in denying his motion to dismiss, and this Court must grant relief. We disagree.

Instantly, Grandfather again cites no law whatsoever to support his claim. (*See* Grandfather's Brief at 50-51). Grandfather's failure to support this claim with relevant legal authority constitutes waiver of the issue on appeal. *See Foster, supra*.

Moreover, we note that at the conclusion of Father's evidence (which consisted of testimony from Father, Trooper Michael Rogers, and Mother), Grandfather moved to dismiss the action. The court heard argument from both parties and denied the motion. (*See* N.T. Hearing, 6/29/22, at 150-155). Specifically, the court stated:

> I am mandated at this juncture to accept in the light most favorable to [Father] all the facts as true. What do we have here? Well, I haven't heard the whole case. I have only heard the one side that has rested. But I will make some comments to supplement the reasons for a decision I am about to enter.
>
> This is a strange set of circumstances. I have read the texts between Grandfather and [Son]. Very unique, indeed.
>
> I am not so sure, [Father], that [Grandfather] has a romantic inclination toward your son. I don't think he is grooming your son for any sexual conduct. Those words have been thrown around, but in common parlance they have a different meaning with what occurred here.
>
> However, as the finder of fact, while there's been no abduction, while there is no romantic relationship, while there is no grooming, Grandfather's behavior I find to be troubling. He is not a doting grandfather; he is an obsessive

- 42 -

grandfather.

Now, that in itself it not a crime, not at all. It's disturbing, but it's not a crime. But we are not here on a criminal matter. We are here on whether or not there is sufficient evidence to enter a protection Order.

I haven't heard the entire case. Grandfather has a right to defend himself, and I am going to protect that right. But I have the authority to enter a temporary Order, and I will. And here [are] the reasons why: Yes, we have talked about [Son]. He is a child who apparently has some issues such as Tourette's, anxiety, ADHD. Not of his own making. He is, perhaps because of those conditions, especially vulnerable. Grandfather knows that.

What troubles me is that without any prompting, without any requests, he, of his own accord, travels from Baltimore, Maryland, to Upper Black Eddy and, without notice, without an invitation, enters the life of his son [Father], who wants nothing, really, to do with him. He claims he only wants to see his grandson. "Why can't I see my grandson?" That's what he said to the trooper.

Well, there is a reason why you can't see your grandson, [Grandfather], because your son [Father] says no.

Now, we grant, in Pennsylvania, very liberally the right of grandparents under certain circumstances to obtain partial custody of their grandchildren. Not every state does that. We have fairly liberal laws to allow that. But this isn't a custody case. It's more than that.

I am troubled by the fact that, again, without any reason other than to cause harassment to [Father], you surreptitiously arrange to meet with [Son] at the Bridgeton House. That's unnatural, and it's uncalled for, and it's wrong. And it's also tantamount to harassment. This is a recipe for disaster.

I am not so sure that the change in [Son's] behavior, as noted by his treating psychiatrist, is directly related to [G]randfather's conduct, but it certainly does not help.

What bothers me is he has said, so far without rebuttal, that he wanted full access to the children.

It's not your decision to make. That's a parental decision. Father and his wife, [Mother], have every right to say, "Grandpop, you are out of the picture." I'm troubled by the fact that you have said to them you could and would do anything, that you will make their lives miserable.

That, to me, would create some fear in my mind as to your behavior, especially since this is not a one and done, but this is continuing. It takes a special mind to purchase a townhouse next to a place where your son lives for the specific purpose of seeing your grandson on the sly. It takes an even more diabolical mind to put aside whatever you are doing in Maryland and to come up without notice, without invitation, to Bucks County and communicate threats. And a threat to [Mother]…is a threat to [Father] as well.

I hear that you are screaming, that you are acting out, you are storming into the home. You demand full access to the children. If they want to do it, that's fine. If not, you won't take no for an answer.

So I think in addition to being unhinged, you are potentially volatile.

Now, is this the classic [PFA] case? No. But the object, according to the legislative history in the [PFA] Act, is to prevent the abuse from occurring.

And, to me, this is rising to a level within the Statute under the subsection which states that if a person stalks another without any valid reason, that, in and of itself—and this is stalking, no question about it. There is no valid reason other than your own selfish reasons. You will not be denied from having contact with them or with their child. That type of talking is repeated. It's a course of conduct. You are following [Father's] family…without any proper consent or authorization to do so.

And, taken as a whole, given all of these circumstances, it would be reasonable for them to assume that they are in fear of bodily injury. Doesn't have to be death, just bodily

injury.

> So looking at the Act, its object is to stop the abuse. The only way I am going to stop it is to enter a temporary Order, so I will. …

(*Id.* at 155-161). The record supports the court's statements. Thus, even if Grandfather had preserved this issue on appeal, it would not have entitled him to any relief. Therefore, Grandfather's issues are either waived, abandoned, or meritless. Accordingly, we affirm the entry of the PFA order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/28/2023